**DISSENTING and Opinion Filed August 27, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00579-CV

**AEROTEK, INC. AND J.R. BUTLER, INC., Appellants**
**V.**
**LERONE BOYD; MICHAEL MARSHALL; JIMMY ALLEN.; AND TROJUAN CORNETT, Appellees**

**On Appeal from the 95th District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-00907**

## DISSENTING OPINION

Before Justices Bridges, Partida-Kipness, and Carlyle
Opinion by Justice Bridges

I respectfully dissent from the majority's opinion and judgment because I would conclude

the trial court abused its discretion in denying the motion to compel arbitration filed by Aerotek

and joined in by HCBeck Ltd. and J.R. Butler, Inc.

Arbitration has been defined as:

a contractual proceeding by which the parties to a controversy or dispute, in order
to obtain a speedy and inexpensive final disposition of matters involved voluntarily
select arbitrators or judges of their own choice, and by consent submit the
controversy to such tribunal for determination in substitution for the tribunals
provided by the ordinary processes of the law.

*Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 268 (Tex. 1992) (quoting *Alderman v. Alderman*,

296 S.W.2d 312, 315 (Tex. App.—San Antonio 1956, writ ref'd)).

Both parties agree the FAA governs this arbitration dispute. In such a case, the FAA applies to the substantive rules of decision, but Texas law, and specifically the Texas General Arbitration Act (TAA),[1] governs the procedural matters. *In re Chestnut Energy Partners*, 300 S.W.3d 386, 395–96 (Tex. App.—Dallas 2009, pet. denied) (citing *Tipps*, 842 S.W.2d at 272; *Craig v. S.W. Sec., Inc.*, No. 05-16-01378-CV, 2017 WL 6503213, at *2 (Tex. App.—Dallas Dec. 18, 2017, no pet.) (mem. op.). The FAA makes arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017) (quoting 9 U.S.C. § 2). That statutory provision establishes an equal-treatment principle: A court may invalidate an arbitration agreement based on "generally applicable contract defenses" like fraud or unconscionability, but not on legal rules that "apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). The FAA thus preempts any state rule discriminating on its face against arbitration—for example, a "law prohibit[ing] outright the arbitration of a particular type of claim." *Id.* (quoting *Concepcion*, 563 U.S. at 339). The FAA only preempts contrary state law, not consonant state law. *In re D. Wilson Const. Co.*, 196 S.W.3d 774, 779 (Tex. 2006). The FAA applies to all suits in state and federal court when the dispute concerns a "contract evidencing a transaction involving commerce." *Tipps*, 842 S.W.2d at 269–70 (quoting *Perry v. Thomas*, 482 U.S. 483, 489 (1987)).

In general, a party seeking to compel arbitration under the FAA must establish that: (1) there is a valid arbitration agreement, and (2) the claims raised fall within that agreement's scope. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005). When the parties dispute whether a valid arbitration agreement exists, the party seeking to compel arbitration must show by

---

[1] TEX. CIV. PRAC. & REM. CODE ANN. §§171.001-171.098.

"a preponderance of the evidence that the [opposing party] has entered into a valid arbitration agreement." *In re JP Morgan Chase & Co.*, 916 F.3d 494, 503 (5th Cir. 2019).

The record shows J.R. Butler is a commercial subcontractor specializing in engineering, design assist, and installation of glass, polycarbonate, and photovoltaic skylight systems and curtain wall, storefront, and ribbon window wall systems. Beginning in November 2016, Butler began work on the JP Morgan Chase Project construction project in Plano, Texas, where it acted as the glass installation contractor (the "Texas Project"). In order to staff the Texas Project, Butler entered a services agreement with Aerotek to provide supplemental staffing services in the form of temporary contract employees. The services agreement expressly stated that Butler was a client of Aerotek. As contemplated in the services agreement, Aerotek provided contract personnel to Butler to assist it with its staffing needs on the Texas Project, which was managed by HCBeck as the general contractor. Just prior to beginning work for Butler on the Texas Project, appellees each executed Aerotek's mutual arbitration agreement.

Appellees filed an original petition in January 2018 asserting claims against appellants arising out of appellees' employment with Aerotek. Aerotek filed a motion to compel arbitration asserting all four appellees entered into an agreement to arbitrate. Specifically, Aerotek alleged appellees were employed by Aerotek to work for J.R. Butler at the JP Morgan Chase construction project managed by HCBeck in Plano, Texas. Before beginning work, each appellee completed Aertotek's pre-employment paperwork, which included a Mutual Arbitration Agreement ("Agreement"). Aerotek alleged Lerone Boyd signed his Agreement on November 22, 2016; Michael Marshall signed his agreement on November 17, 2016; Jimmy Allen signed his Agreement on March 14, 2017; and Trojuan Cornett signed his Agreement on November 15, 2016. Under the Agreements, Aerotek alleged, appellees were required to arbitrate their claims against Aerotek. Appellees responded that, among other things, they "expressly and affirmatively den[ied]

having ever seen an agreement to arbitrate claims (before this lawsuit was filed), let alone actually agreed to arbitrate claims against any Defendant." As the majority sets out, attached to the response were individual declarations stating, among other things, appellees "had never seen" the Agreement before it was produced in the underlying lawsuit; "did not sign any document, electronically or otherwise, providing my agreement to arbitrate claims against Aerotek or any of its customers"; and were never presented with any document, electronic or otherwise, that "mentioned arbitration," "stated I was consenting, would be consenting, would be required to consent, or had consented , to arbitrate" claims against Aerotek. On these and other similar denials, appellees based their argument that they should not be compelled to arbitrate their claims against appellants.

At the *Tipps*[2] hearing, Phaedra Marsh testified she is a program manager with Aerotek's technologies department and has worked for Aerotek for almost twenty years. Marsh testified she worked with Aerotek's IS department to design and develop its on-boarding technology application. Marsh testified she "created the process" for "on-boarding candidates for potential positions with Aerotek's clients," and she was "capable of explaining to the Judge and with some degree of detail how that process works today." Aerotek's counsel asked Marsh to describe how the process works after a particular candidate receives a conditional offer of employment. Marsh testified that, after the candidate accepts the conditional offer, Aerotek creates an invitation based on the candidate's requirements and emails it to the candidate's personal email address provided by the candidate during their application process. At that stage of the process, administrative assistants also provide a "welcome call" to explain the process to the candidate, review some

---

[2] As the majority correctly sets out, where a party seeking to compel arbitration provides competent, prima facie evidence of an arbitration agreement, and the party seeking to resist arbitration contests the agreement's existence and raises genuine issues of material fact by presenting affidavits or other such evidence as would generally be admissible in a summary proceeding, the trial court must forego summary disposition and hold an evidentiary hearing. *Kmart Stores of Tex., L.L.C. v. Ramirez*, 510 S.W.3d 559, 565 (Tex. App.—El Paso 2016, pet. denied) (quoting *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 269 (Tex. 1992) (orig. proceeding)). Where the trial court conducts such a "*Tipps* hearing," and thereafter makes a ruling, we review the trial court's findings for legal sufficiency. *Id.*

frequently asked questions about how to log in, and "prepare them for the process." The invitation email itself gives the candidate instructions on how to log in to the on-boarding system, information on how long the process will take, and a description of information they might need once they log in. The invitation also contains links the candidate can click on to register for an account for their registration process. Marsh testified the links are "very specific to each candidate." Aerotek's counsel asked Marsh at trial in April 2018 how the process was different from the way it was in November 2016 and March 2017 when appellees went through the process. Marsh answered, "The process hasn't changed."

Marsh testified that Aerotek launched "over 465,000 invitations [in] 2017." Marsh testified the online system was launched in February 2015, and "this arbitration agreement [had] been in" since Aerotek developed the system in 2015. Aerotek's standard operating procedure was for candidates to complete their paperwork from home because it was not feasible to have all of the candidates come to Aerotek's offices to complete the process. However, if a candidate needed help with the process, the candidate could come to Aerotek's office for assistance. The record shows that, at this point in her testimony, Marsh presented a demonstration of the on-boarding process on her laptop. Marsh's accompanying testimony shows the demonstration began with the launch of an invitation Marsh had sent to her personal email account. The invitation contained basic information and links allowing a candidate to register for an account. Marsh clicked on the first link in order to create a user ID and password, and she explained that this requirement was for security purposes because the information and personal data provided is sensitive. Also for security purposes, candidates were asked to create security questions, and they had to answer the questions every time they logged in to the system. The system allows a candidate to stop the process and come back later to finish their paperwork, but every time they log in, they have to answer the security questions.

After logging in, the first thing the candidate sees is the "electronic disclosure" which "explains that they agreed to use an electronic signature in lieu of a handwritten signature throughout the process." Once the candidate clicks an acknowledgement and electronically signs, "an identifier pops up again to verify their identity to make sure they are the person that created that account." Marsh testified, "once that is signed, the rest of the paperwork is now ready to begin." Marsh described the layout of the screen as follows:

> You'll notice on the left-hand side of here that only one document is accessed. It's got a clock on it. It shows it's open. The rest of these are locked. The paperwork has to be completed in the order that it's presented. And you'll notice across the top the additional sections are all locked, and these sections will remain locked until the candidate completes this first section and each section going forward. So it doesn't allow them to get out of order in completing their paperwork.

Marsh then proceeded to describe the steps in the process, beginning with the entry of personal information that "is going to be populated on any of the forms going forward." "[O]nce they've entered in their biographic information, they're going to save the data, and this form doesn't automatically move forward because we want them to review their data just to make sure it's correct." Once the candidate validates the information is correct and clicks continue, the program automatically moves to the next document in the process: the employment agreement. Marsh testified that these initial categories were "all a subpart of the employee information box at the top." Marsh testified the next section, "prescreen," was locked and would not unlock until all categories in the employee information section were complete. In the prescreen section, candidates could download and review "policy documents," but each step in the prescreening process had to be completed in successive order to get to the next. As Marsh went through each step, she clicked on an electronic signature that caused the system to affix the candidate's signature electronically to the document. Marsh testified the system was "also time and date stamping the time in which [the candidate] signed that particular document."

Marsh testified that, after completing a pay preferences section, the candidate came to the policies and procedures section. In this section, the first five documents opened up automatically and could be completed in any order; however, the candidate could not "move forward without completing all five of these documents." The mutual arbitration agreement appeared in this section. Once the policies and procedures section was completed, the candidate moved on to the worker's compensation, employee handbook, safety handbook, benefits, and "finalize and submit" sections. Marsh testified a candidate could not get to the last step of finalizing and submitting the data without completing each and every step she walked through.

Marsh testified Aerotek could view the invitations in progress and determine the extent to which a particular candidate had completed the on-boarding process. Once the process was completed, Aerotek had "the ability to act on them because we utilize that data to download into our HRIS system. At the urging of Aerotek's counsel, Marsh logged on to the system and viewed Chris Boyd's invitation and completed paperwork. The system showed Boyd signed the documents in the policies and procedures section, including the mutual arbitration agreement, which Boyd signed at 11:02 a.m. on November 22, 2016. When asked if there was a way to know whether Boyd completed the process, Marsh testified the next section of the process opened up for Aerotek's administrative staff to complete once the paperwork was completed. The administrative staff then sent the information to Aerotek's HRIS system so that payroll could be set up, "and these steps won't open until all of these in front of them are done." Marsh testified that Boyd's electronic signature on the electronic disclosure acknowledgment meant that Boyd "logged in and created an account and then electronically signed this document."

Aerotek's counsel introduced hard copies of each appellee's mutual arbitration agreement. Marsh testified that the signatures on the agreements "indicate[d] that the person that logged in, whoever it was that signed this document, is the one that signed that document." Aerotek's counsel

pointed out that Boyd, Marshall, and Cornett all submitted affidavits stating they reviewed the terms, conditions, policies and/or procedures online and signed the documents electronically. Aerotek's counsel then asked Marsh if there was more than one online process, and Marsh answered that "this is the only online process." Aerotek's counsel asked Marsh the following:

> So if these individuals did what they said in their affidavit and they went online, they went through the process, they reviewed the terms and conditions, policies and procedures and they affixed electronic signatures as they said they did and they submitted the information to Aerotek, is there any possible way that you can imagine that they could have done that without executing the arbitration agreement?

Marsh answered, "Not with this process. It's locked throughout the process, so they have to complete everything in that section before they can get to the finalize and submit section. So everything has to be signed and completed before they get there."

As the majority correctly points out, on cross-examination Marsh testified she has worked for Aerotek for twenty years, she works with Aerotek's IT department to "manage this process," she helped Aerotek's IT department "create this process," she was "not the person who created the computer system itself," Aerotek purchased the application from a vendor and used Aerotek's IT department to "attach it to our HRIS system," and she "worked with the vendor as well as IT to build out all the forms that are in this process." Marsh testified she "did not do any" of the "computer programming that goes into this on-board processing" and she is not an "IT expert," but she did "all the testing on this system." Marsh testified she had had a computer "lock up" for "no reason," seen a "computer glitch," and had the system go offline. In response to questioning from the trial court, Marsh testified that Aerotek has four different servers that "houses the data when we launch the invitation," and if one of the servers went down a candidate would "not be able to click on the link that takes them into the invitation." However, once the server came back up, "they can click on the link and do their paperwork." Other than questions during cross examination about computers going down, there was absolutely no evidence from any of the

appellees that anything out of the ordinary happened to cause a dropped or failed connection. Appellees in their brief argue as follows:

> The best example that everyone has experienced is a failed or dropped cellular telephone call. The "normal" procedure for starting a cellular telephone call is to press the numbers on the phone that one desires to call, and then press a telephone icon to initiate the call. The "normal" procedure results in "ringing" the phone number called. However, this "normal" procedure routinely fails. Many times, when the "normal" procedure is followed, nothing happens. This requires the caller to "end" the non-call and re-initiate it. This is certainly not the intended result of the "normal" procedure, but it is a technological "glitch" that happens thousands of times a day throughout the United States.

Nevertheless, there is no evidence in the record that there was ever a glitch or that a glitch would fill in the paperwork requiring arbitration for any candidate, much less appellees.

On this record, however, the majority concludes that the trial court may have concluded Marsh had insufficient capacity to establish the on-boarding system was failsafe. In reaching this conclusion, the majority appears to rely on Marsh's testimony that she could not "think of" another way a candidate's name could appear on an on-boarding document if the candidate did not go through the on-boarding process Marsh described. Relying on *Kmart Stores of Texas, L.L.C. v. Ramirez*, 510 S.W.3d 559 (Tex. App.—El Paso 2016, pet. denied), the majority concludes that Marsh's failure to vouch for the electronic records' integrity and failure to adequately explain the security measures Aerotek took left it within the trial court's discretion to determine that Aerotek's evidence was not conclusive.

In *Kmart*, Norma Ramirez began working for Kmart on May 23, 2010. *Kmart*, 510 S.W.3d at 562. In April 2012, Kmart introduced an arbitration policy requiring submission of all disputes between employees and the company to arbitration. *Id.* Kmart maintained that, by September 14, 2012, its employees, including Ramirez, were required to complete a series of policy acknowledgments on Kmart's online portal. *Id.* Among the policies was an arbitration agreement. *Id.* When Ramirez later sued Kmart, Kmart moved to compel arbitration, submitting as evidence

the affidavit of Roberta Kaselitz, Kmart's compliance programs manager, and exhibits setting out the arbitration agreement and demonstrative screenshots from Kmart's online portal. *Id.* at 563. Kaselitz' affidavit described the process an employee had to undertake in order to access and acknowledge the arbitration agreement. *Id.* at 562. The process included entering the employee's user ID and password, following a link "policy acknowlegments," and following hyperlinks to the arbitration agreement itself. *Id.* at 563. Kaselitz' affidavit stated Ramirez received copies of the arbitration agreement when an "Arbitration Policy/Agreement 'Course'" was created in Kmart's computer system in February 2012, and the system reflected Ramirez' acknowledged receipt of the arbitration agreement on April 23, 2012. *Id.* In response, Ramirez filed an affidavit in which she stated that she had never electronically acknowledged or agreed to any arbitration agreement.

At a subsequent *Tipps* hearing, Ramirez testified she did not log on to Kmart's online portal on April 23, 2012 to view an arbitration agreement; she did not click on a screen saying that she acknowledged receipt of the arbitration policy or agreement link; and she was not ever presented with an arbitration agreement at any time during her employment. *Id.* at 564. Ramirez admitted using Kmart's online portal before and reviewing some policies electronically at the beginning of her employment, but she denied logging on to Kmart's network on April 23, 2012, except to clock in for work. *Id.* In deferring to the trial court's determination that Kmart's motion to compel arbitration should be denied, the court in *Kmart* noted Kmart had "failed to cite any authority requiring the courts to give presumptive credence to an employer's electronic records over an employee's testimony in arbitration determinations." *Id.* at 571. In reaching this disposition, the court stated in a footnote that, in her affidavit, Kaselitz "never vouches for the integrity of [Kmart's electronic] records or explains any security measures Kmart uses to ensure its computer systems or software cannot be tampered with." *Id.* at 570 n.6. "Absent even that bare showing," the court continued, "we will not craft a rule that automatically credits an employer's records over an

employee's testimony as a matter of law." *Id.* Thus, the *Kmart* court perversely reasoned that Kmart's failure to offer evidence of the integrity of its records or efficacy of its security measures established the opposite: that its security measures were ineffective and its records were susceptible to tampering by an unknown actor who acknowledged Kmart's arbitration policy without Ramirez' knowledge or consent.

Following its opinion in *Kmart*, the El Paso court of appeals issued *Alorica v. Tovar*, 569 S.W.3d 736, 742-44 (Tex. App.—El Paso 2018, no pet.), a case cited favorably by the majority. In *Alorica*, in response to her employer's motion to compel arbitration, an employee submitted an affidavit stating she had never seen or heard of the arbitration agreement at issue in the case until after she filed suit. The court described *Kmart* as a case in which the court "found that the conflict between the employer's records and the employee's sworn denial created a fact issue in contract formation, meaning that the trial court could find in either the employer or the employee's favor." *Id.* at 741. The court determined that the employee's sworn denials were sufficient to create a fact issue that the trial court could resolve in the employee's favor after a *Tipps* hearing. *Id.* at 744. Declining to undertake a factual sufficiency review, the court concluded, "We are only explicitly permitted to use the legal sufficiency standard in measuring fact questions related to arbitration." *Id.* at 744 (citing *Kmart*, 510 S.W.3d at 570). Under that standard, the court stated it "must uphold the trial court's decision if there is some evidence more than a scintilla to support it *unless* [the employer] establishes notice [of the arbitration provision] *as a matter of law*." *Id.* The court acknowledged "a handful of federal district court cases in which judges faced with the same factual dilemma presented here decided in favor of the employer, not the employee," but dismissed these cases as only demonstrative of "how various trial judges resolved evidentiary discrepancies in the record." *Id.*

–11–

*Tipps* holds that, if the material facts necessary to determine the issue of whether to compel arbitration are controverted, the trial court must conduct an evidentiary hearing to determine the disputed material facts. *Tipps*, 842 S.W.2d at 269. However, *Tipps* is silent on the parties' evidentiary burdens at the *Tipps* hearing and on the standard of review this Court should apply when reviewing the trial court's determinations at the hearing. The El Paso court of appeals says that the fact issue that entitles a party to a *Tipps* hearing is sufficient, apparently without further evidence, to support the trial court's resolution of the matter on the fact issue alone and render a decision in favor of the party who raised the fact issue. *See Alorica*, 569 S.W.3d at 741-44.

Under the rationale of *Kmart* and *Alorica*, as exemplified by the majority opinion, a *Tipps* hearing becomes an opportunity for the trial court to determine whether or not to compel arbitration, regardless of the strength of the evidence supporting the motion to compel arbitration or the bad faith of the affidavits that created a "fact issue" necessitating the Tipps hearing in the first place. In an analogous situation, the Texas Supreme Court, in a summary judgment case, refused to limit a party's remedies to sanctions and contempt when a party filed a bad faith affidavit in an attempt to avoid summary judgment. *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 88-89 (Tex. 2018). The court noted that the federal rules regarding bad faith affidavits include a residual clause allowing the trial court to order "other appropriate sanctions" which can include striking the affidavit. *Id.* at 88. Without allowing bad faith affidavits to be stricken, the court reasoned, "the result would be that even the most flagrantly bad-faith affidavits could be used to survive summary judgment." *Id.* at 89. As the record developed at the *Tipps* hearing, I would conclude the affidavits in this case were filed in bad faith and therefore constituted no evidence.

The record is clear that appellees contacted Aerotek about obtaining employment as temporary construction workers. Appellees provided their email addresses to Aerotek, and Aerotek sent appellees invitations to log on to the on-boarding system with their individually

created passwords. In addition to Marsh's detailed testimony concerning the on-boarding process, the record contains time-stamped computer records showing each appellee's completion of each step in the process. Boyd's record, for example, shows that on "11/22/16" he completed the electronic disclosure section at 10:32 a.m.; completed the biographical information section at 10:37 a.m.; completed the employment agreement section at 10:41 a.m.; and continued to complete the sections in order, including the mutual arbitration agreement section at 11:02 a.m., before submitting his paperwork for review at 11:07 a.m. The record contains time-stamped records showing each of the appellees completed the on-boarding process in the same sequence. Having completed the on-boarding process, appellees went to work for Aerotek. Appellees' own affidavits stated they went online, completed the process, and submitted the information to Aerotek.

The majority concludes the trial court would have been well within its discretion to discredit Marsh's testimony because Marsh was an "interested witness" with twenty years' experience with Aerotek, and she lacked expertise and involvement in the IT and programming aspects of the system. Oddly, the majority finds no fault in treating the affidavits submitted by appellees as sufficient to create a fact issue warranting the hearing despite their own more direct interest in pursuing their own claims for money damages or avoiding arbitration. I find no evidence that Marsh's employment with Aerotek, alone, makes her an interested witness on the issue of whether appellee's claims should be submitted to arbitration, especially in light of the fact that Marsh knows appellees all had to sign an agreement to arbitrate before being accepted as Aerotek employees. Neither the record nor the parties' briefs make this "interested witness" argument. In addressing this issue, the majority appears to be addressing an issue raised in the *Kmart* case. *See Kmart*, 510 S.W.3d at 570. Further, when considering testimony about such "clickwrap" online agreements, this Court has not required that the affiant demonstrate specialized or technical knowledge of the software design of the online portal used by the company. *Kyäni,*

*Inc. v. HD Walz II Enters., Inc.*, No. 05-17-00486-CV, 2018 WL 3545072, at *4 (Tex. App.—

Dallas July 24, 2018, no pet.) (mem. op.).

In addition, the majority finds section 322.009 of the Texas Business and Commerce Code

provides no basis to disturb the trial court's determination. Section 322.009, entitled "Attribution

and Effect of Electronic Record and Electronic Signature," provides the following:

> (a) An electronic record or electronic signature is attributable to a person if it was the act of the person. The act of the person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable.

> (b) The effect of an electronic record or electronic signature attributed to a person under Subsection (a) is determined from the context and surrounding circumstances at the time of its creation, execution, or adoption, including the parties' agreement, if any, and otherwise as provided by law.

TEX. BUS. & COM. CODE ANN. § 322.009 (2015). The court in *Kmart* acknowledged "the code

allows courts to infer an electronic record upon 'a showing of the efficacy of any security

procedure applied to determine the person to which the electronic record or electronic signature

was attributable'" but concluded no such showing had been made. *Kmart*, 510 S.W.3d at 570 n.6.

The court stated that Kmart's expert, in her affidavit, "explains that she has knowledge of the

company's computer system and electronic HR records, but she never vouches for the integrity of

those records or explains any security measures Kmart uses to ensure its computer systems or

software cannot be tampered with." *Id.* "Absent that bare showing," the court declined to "craft

a rule that automatically credits an employer's records over an employee's testimony as a matter

of law." *Id.* What was missing there and here, apparently, was the in-person testimony of the

software writer–a standard that would make electronic contract formation practically impossible

and write section 322.009 out of the law. The majority effectively dismisses Marsh's testimony

as "evidence suggesting [appellees] electronically signed the arbitration agreements" and

concludes the trial court was within its discretion in finding Aerotek's evidence was not conclusive

"[a]bsent other evidence on system security." Both the court in *Kmart* and the majority disregard the plain language of section 322.009(a) providing "[t]he act of the person may be shown in *any manner*." TEX. BUS. & COM. CODE ANN. § 322.009(a) (2015) (emphasis added). "[A] showing of the efficacy of any security procedure" is only one way of showing the act of the person, not the only way. *Id.* I would conclude that Marsh's detailed testimony constituted one way in which appellees acts of electronically signing the arbitration agreements at issue could be shown. *See id.*

Finally, I would agree with Aerotek's argument that affirmance here "jeopardize[s] all electronically signed agreements" and "essentially means there are no enforceable agreements." This would allow any party to a contract signed electronically to deny the existence of the contract even in the face of overwhelming evidence that the contract was signed. Further, this holding amounts to a state rule discriminating on its face against arbitration, which is expressly prohibited. *Clark*, 137 S.Ct. at 1426. In any other contractual context, a bad faith affidavit denying the existence of a contractual provision, without more, could not withstand summary judgment or form the basis for a judgment in favor of the party proffering the affidavit.

I believe that *Kmart* and *Alorica* were wrongly decided. We are faced with the dilemma of how we will review electronically-signed contracts. This Court's resolution of this issue implicates much more than arbitration. A court is supposed to favor arbitration and treat agreements to arbitrate no less favorably than other contracts. Arbitration streamlines court cases but takes away a trial before a jury.

Every day, millions of agreements are made online without the benefit of a "wet ink" signature. Those agreements are upheld. In this case, four men in Dallas seeking a job through a national staffing company logged in with their email, established passwords, and gave all their personal information. This allowed them to be paid. The men agreed to all the documents in the on-boarding process including, among others, a pay preferences section. In the middle of the

process, the form included a mutual arbitration agreement.  The men accepted the jobs and the benefits until they were fired.  Now the men want to try their discrimination case before a jury.

Before the trial court was an affidavit from each man saying not that he did not see this agreement but that, in these four cases, the agreement was not there.  They raise the specter of computer error without any evidence to show computer error.  Their argument to the trial court was in the form of questions to Marsh on cross-examination concerning whether there could have been a "glitch" or whether the power could have gone off.  Somehow, this line of questioning translated to a theory under which the computer filled in the arbitration agreement for these four which they electronically signed at the end.  The testimony from Aerotek was clear that the computer does not fill in answers for candidates.  Unlike the majority, I would conclude this testimony constituted uncontested evidence that completing the on-boarding paperwork without electronically signing the arbitration agreement was "physically impossible."

The only issues in this case are whether the arbitration agreement was part of the online process and whether Aerotek presented evidence that a reasonable factfinder could not disregard establishing appellees electronically signed the arbitration agreements at issue despite appellees' statements that they had not agreed to arbitrate.  *See City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005).[3]  On this record, despite appellees' affidavits denying they agreed to arbitrate, I would conclude that a reasonable factfinder could not disregard the evidence establishing appellees electronically signed the arbitration agreements at issue.  *See id.*  I would further conclude the trial

---

[3] Although *City of Keller* was a case arising from a jury trial, a trial court's findings are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's answer.  *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

court abused its discretion in denying Aerotek's motion to compel arbitration and remand for entry of an order compelling the underlying case to arbitration.


/David L. Bridges/
DAVID L. BRIDGES
JUSTICE


180579DF.P05